IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs February 9, 2022

**STATE OF TENNESSEE v. JOEL ERNEST BLANTON**

**Appeal from the Circuit Court for Van Buren County
No. 3051-F   Larry B. Stanley, Jr., Judge**

_____

**No. M2020-00155-CCA-R3-CD**

_____

A Van Buren County Grand Jury indicted the Defendant, Joel Ernest Blanton, for seven counts of rape of his eleven-year-old daughter and one count of aggravated sexual battery of his ten-year-old daughter.  At the conclusion of trial, the jury convicted the Defendant of six counts of rape of a child and two counts of aggravated sexual battery, and the trial court imposed an effective sentence of 212 years.  On appeal, the Defendant argues that the evidence is insufficient to sustain his convictions for rape of a child in Counts 1, 2, and 4 and that his sentence is excessive.[1]  We affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

CAMILLE R. MCMULLEN, J., delivered the opinion of the court, in which ROBERT H. MONTGOMERY, JR., and J. ROSS DYER, JJ., joined.

Michael J. Rocco (on appeal), Sparta, Tennessee; and Bud Sharp (at trial), McMinnville, Tennessee, for the Appellant, Joel Ernest Blanton.

Herbert H. Slatery III, Attorney General and Reporter; Benjamin A. Ball, Senior Assistant Attorney General; Lisa S. Zavogiannis, District Attorney General; and Thomas J. Miner, Assistant District Attorney General, for the Appellee, State of Tennessee.

**OPINION**

The charges in this case arose after K.B. and A.B.[2] disclosed that their father, the Defendant, sexually abused them.  Thereafter, the Defendant was charged with seven counts of rape of a child for the offenses committed against K.B. and one count of aggravated sexual battery for the offense committed against A.B.

_____

[1] We have reordered the Defendant's issues for clarity.

[2] It is the policy of this court to protect the identity of minors.  Therefore, we will identify the minors in this case by their initials.

**Trial.** At the Defendant's April 2018 trial, Danna Goney testified that she and the Defendant were the parents of K.B. and A.B. She said that K.B.'s birthday was February 7, 2005, and that A.B.'s birthday was December 7, 2006. Goney stated that she and the Defendant were never married and that their relationship ended in August 2005. In 2016, Goney asked the Defendant's parents if she, K.B., and A.B. could live with them in their two-bedroom home, and on December 27, 2016, the three of them moved into this home. Goney said that the living arrangements there were "tight" given that the Defendant; his mother, Darlene Blanton; his father, Glenn Blanton; and the Defendant's adult daughter from a previous relationship, Samantha Blanton, already lived there.[3] Goney shared the "back bedroom" with A.B., and although the Defendant was supposed to be sleeping on the couch, the Defendant would often "end up" in the bed with K.B. in the "middle bedroom."

Goney and A.B. lived with the Blantons until the end of February 2017, but when they left, the Defendant would not allow K.B. to leave with them. She said the Defendant told K.B. that she "couldn't go, that [she] should stay there and stay with him." At the end of February 2017 or the beginning of March 2017, A.B. told Goney that the Defendant had sexually abused her. Specifically, A.B. told Goney that one night she awoke to the Defendant rubbing her with either his hand or his penis, and she went to the bathroom and discovered that her underwear was wet, so she changed her underwear and got into bed with her grandmother. Goney filed a report about the Defendant's abuse of A.B. with the sheriff's department the next morning, and deputies removed K.B. from the Blanton home, reuniting her with Goney and A.B. Thereafter, A.B. told K.B. about the Defendant's abuse of her, and K.B. said, "Oh, well, he did that to me, too." Goney immediately filed another report with the sheriff's department about the Defendant's sexual abuse of K.B. She also gathered the clothing K.B. had been wearing when she left the Blanton home and took K.B. to the Rutherford County Hospital. Because only a male physician was available, Goney took K.B. to Our Kids at Nashville General Hospital, where a rape kit was collected and a social worker talked to K.B. and Goney separately. She said that Deputy Steve Turpin also collected K.B.'s clothes for testing. Goney later took K.B. and A.B. to the Children's Advocacy Center in McMinnville.

K.B. testified that she was currently thirteen years old and that the Defendant began raping her when she was eleven years old just after she moved in with the Defendant and his family.[4] Regarding Count 1, K.B. said that the first time the Defendant raped her she

---

[3] Because these family members share the same surname, we will refer to them by their first names. In addition, we have referred to other witnesses by their surnames only. We have used these abbreviated references to the witnesses for the sake of efficiency, and we intend no disrespect in doing so.

[4] Although K.B. testified to multiple instances of sexual abuse, we have attempted to summarize only the evidence that is relevant to the issues raised on appeal or that is necessary for a full understanding of the arguments raised.

- 2 -

had fallen asleep in their shared bed, and she awoke to the Defendant "licking" her "private area" on the front of her body, which she also referred to as her "vajayjay" or her "vagina." She said that when the Defendant licked her, he moved her underwear and put his tongue inside her vagina. When she awoke, she told the Defendant that she had to go to the bathroom, and she found "a liquid" in her underwear. When K.B. returned to the bedroom, the Defendant told her that she "shouldn't tell anybody if [she] loved him and that . . . he was the only one that would do that to [her]." The next morning, K.B. told the Defendant's mother, Darlene, that the Defendant had touched her inappropriately, and Darlene went outside and yelled at the Defendant. K.B. said that from December 2016 to February 2017 incidents like the one she just described occurred "ten or 15" times while she was living with the Defendant.

As to Counts 2 and 3, K.B. said that during the day, the Defendant put a condom on his penis and "tried to stick his thingy inside" her "vajayjay." However, she said the Defendant was unable to get his penis inside her vagina, so the Defendant took the condom off and rubbed his penis against her vagina "[j]ust a little bit" before he left the bedroom.

Regarding Count 4, K.B. stated that the Defendant put his penis inside her vagina while they were in the middle bedroom. She stated, "[H]e got, like, there's a head part and he got it inside of my vajayjay hole." She explained that the "head part" was the "tip" of the Defendant's "thingy" that was between the Defendant's legs. K.B. said that the tip of the Defendant's penis got partway inside her vagina.

As to Count 5, K.B. described another incident that occurred when the Blanton family had just torn out the carpet in the living room. She said, "[The Defendant] licked my vajayjay and he rubbed his thingy on me."

K.B. stated that when her mother left the home with her sister, the Defendant kept her from leaving by telling her that she could not go and that she should stay there with him. She said the Defendant also told her that her mother was on drugs and was a thief and that K.B. would have to live in a homeless shelter if she left because her mother did not have a place to live.

Regarding Counts 6 and 7, K.B. recalled an incident with the Defendant that occurred shortly before the deputies came and removed her from the Defendant's home. She said that the Defendant "was licking [her] vajayjay" and that the Defendant's tongue was going inside her "vajayjay." She also said the Defendant "rubbed his thingy" on her "vajayjay[,]" and it went inside it "[j]ust a tiny bit." K.B. stated that "there was, like, a liquid that came out of his thingy and it got on me" and that this liquid was "white and milky and weird." She said that this incident occurred after lunch and that the Defendant had left the home by the time the deputies removed her from the home that night. K.B.

asserted that the Defendant's home had a camera on the porch that was hooked up to a television that allowed the Defendant to keep track of when people were arriving and leaving the home. She said that when the deputies removed her from the Defendant's home, they brought her to her mother, who immediately drove her to her grandmother's home in Van Buren County. When they arrived, K.B. said A.B. told her that the Defendant had touched her inappropriately and then her mother called the sheriff's department when K.B. disclosed that "the same thing happened to [her]." K.B. said that when she got to her grandmother's home, she was wearing the same clothing that she had been wearing during the last incident with the Defendant. K.B. said that during these incidents the Defendant compared her to his wife Felicia and to K.B.'s mother, Danna Goney, and said that K.B. "was the best" and "was better than them." K.B. also said that the Defendant called her "vajayjay" a "gold mine."

On cross-examination, defense counsel claimed K.B. had just testified on direct that during the second incident the Defendant "rubbed against [her] vajayjay" and "didn't put anything in [her]," and K.B. replied, "Yes." K.B. admitted stating during her forensic interview that she did not really remember the second incident with the Defendant because she had a "forgetful memory." Later, during cross-examination, defense counsel said, "So the first time you say he just rubbed against you but didn't put anything in you; correct?," and K.B. replied, "Yeah." Defense counsel then stated, "The second time you said that he put a squishy thing in you; correct?," and K.B. answered, "Yes." Defense counsel then stated, "And then the third time you said that he tried to put something in you and then he jumped up and ran out of the house and the police were there; right?," and K.B. replied, "Yeah." She also said that the Defendant gave her Viagra, although he gave it to her during a different incident than the ones she had just described.

On redirect examination, K.B. stated that during one incident, the Defendant ran outside when the deputies arrived at the Blanton home. However, she said that on a different occasion when the deputies actually removed her from the home the Defendant was not present.

A.B. testified that while she was living in the Blanton home, the Defendant sexually abused her one time. On that occasion, the Defendant, who wore only his underwear, put his leg over A.B.'s body, and "rub[bed] [her] down in the inappropriate part." A.B. explained the "inappropriate part" was her "bottom" and that she did not know what the Defendant was rubbing against her. She said she immediately got out of bed because she had to go to the bathroom and felt something strange around her butt. When she got to the bathroom, A.B. observed "this clear-type, gel stuff in [her] underwear." She said that approximately a month after leaving the Blanton home, she told her mother what happened with the Defendant, and her mother contacted the sheriff's department.

- 4 -

M'Lee Hudgins testified that she was a forensic interviewer with the Children's Advocacy Center in McMinnville. She stated that on March 2, 2017, she interviewed K.B. and A.B. regarding the charges in this case.

The video recordings of K.B. and A.B.'s forensic interviews were admitted as substantive evidence. During the forensic interview, K.B. stated that the first time the Defendant sexual abused her was in December 2016 on the first night she stayed at her father's home when she was eleven years old. She said she was asleep, and she awoke when her father licked her vagina. She said her father told her that he was the only one who would do this to her and that if she told someone, then she did not really love him. Later, K.B. told her grandmother, Darlene, what her father had done, and her grandmother yelled at him, but her father kept abusing her. She said her father used his tongue on her vagina "a lot." K.B. described another incident in which her father put on a condom and then took it off because it was uncomfortable. Her father then rubbed his penis against her and then stuck his penis all the way in her "butthole" and pushed her up and down until "stuff" came out of his penis. K.B. said that in December 2016 or January 2017 there was another incident that occurred in the middle of the day when her father got the "head" of his penis inside her "vajayjay hole," which "hurt." She stated that "stuff came out" of his penis that was "white, liquidy [sic]." K.B. said her father told her that even if someone put a gun to her head, she could not tell them what he did to her. K.B. also asserted that there was an incident in mid-January 2017 at a time when the Blantons were tearing out the carpet in the home. She said she went into her father's room to get some gum, and her father threw her on the bed and made her take off her clothes. Her father rubbed his penis against her "vagina," her "vajayjay hole," her "butt," and her "butthole," and he kissed her breasts. He also licked her vagina and stuck his penis in her "butthole." K.B. said her father stuck his penis in her "butthole three or four times." K.B. said that the last incident occurred the previous Monday, when her father put his tongue inside her "vajayjay" and the "cops" came, so her father ran outside. She said she had collected the underwear she had been wearing during the incident to see if her father's DNA was on it.

Heidi Dennis, a nurse practitioner at Our Kids in Nashville, testified that she conducted a medical examination of K.B. at Nashville General Hospital on March 1, 2017, at 3:36 a.m. Dennis said K.B. told hospital staff that that the Defendant had "touched her inappropriately with his thingy," which K.B. said was the Defendant's "penis." K.B. also said the Defendant called his penis "Mr. Squishy" and called K.B.'s vagina her "temple," although K.B. referred to this body part as her "vajayjay." K.B. stated that the Defendant rubbed "his thingy" on her "vajayjay" and "tried to stick the head of his thingy" in her vagina but "only the head" went in. K.B. also pointed to her anus area and said that the Defendant stuck his penis "all the way in the back" and "pushed in there and held it until the stuff came out of his penis." In addition, K.B. asserted that the Defendant made her "rub his thingy up and down" and "made [her] kiss it once but just once" and that the

Defendant licked her "with his tongue down there" and pointed to her vagina. Dennis said that when she examined K.B. she did not observe any signs of physical injury to the vaginal area or the anal area; however, she said this was not usual in cases where there are allegations of sexual abuse. Dennis then obtained a sample for the sexual assault kit and referred K.B. and her family to the Children's Advocacy Center in McMinville. The Our Kids report was admitted into evidence.

Lieutenant Steve Turpin of the Van Buren County Sheriff's Department testified that he first met Danna Goney, K.B., and A.B. at the Children's Advocacy Center. He observed K.B.'s and A.B.'s forensic interviews and collected the clothing K.B. had been wearing when Danna Goney brought her home. Lieutenant Turpin collected a buccal swab from the Defendant after his arrest. He then delivered K.B.'s sexual assault kit, the Defendant's buccal swab, and K.B's clothes to the crime lab at the Tennessee Bureau of Investigation (TBI).

Special Agent Alyssa Manfredi, a forensic scientist with the TBI, testified that she found sperm on both the perineal swabs and the underwear collected as a part of K.B.'s sexual assault kit. However, because of the small amount of sperm on these items, she was unable to determine to whom this sperm belonged. Special Agent Manfredi also found that there was sperm on the pair of K.B.'s underwear that Danna Goney had given to Lieutenant Turpin, and she was able to determine that this sperm belonged to the Defendant. She opined that the odds of this sperm belonging to an individual other than the Defendant were "1 in a number greater than the current world population for African-American, Caucasian, and Southwestern Hispanic." Special Agent Manfredi opined that the sperm on K.B.'s underwear was not transfer DNA because of the substantial amount of sperm present on the underwear. Her official Forensic Biology Report was admitted into evidence.

In a hearing outside the presence of the jury after the conclusion of the State's proof, the Defendant made a motion for a judgment of acquittal on all counts. The trial court held that the evidence was sufficient to support a conviction for each count, except Count 3 charging the Defendant with rape of a child. It then ordered that the jury be charged in Count 3 with the lesser included offense of aggravated sexual battery.

The Defendant, Joel Ernest Blanton, testified on his own behalf. He stated that he had never sexually abused A.B. or K.B. He said that A.B. and K.B. never seemed upset while they lived with him and that they never said they did not want to live in his home. The Defendant claimed that the day K.B. was removed, he left his home around 9:00 a.m. and spent most of the day at his wife's home in McMinnville.

On cross-examination, the Defendant acknowledged that there was a court order prohibiting him from being around A.B. and K.B. prior to the time that Danna Goney and

the children moved into his home. The Defendant denied ever sleeping in the same bed as A.B. and K.B. He also denied ever being alone with A.B. or K.B. during the entire time they lived with him.

A few female family members testified on the Defendant's behalf. Elaina Coldwell, the Defendant's daughter, testified that she believed Danna Goney, K.B., and A.B. moved out of the Blanton home because Goney had stolen money and medication from Glenn Blanton, the Defendant's father. Teresa Blanton, the Defendant's sister, testified that Darlene Blanton told her that Goney used K.B. to help her steal the money and medicine from Glenn Blanton. She asserted that K.B. and A.B. never looked upset or unhappy while they were living with the Defendant and that K.B. and A.B. never tried to talk to her about anything that caused her concern regarding their safety and welfare. Darlene Blanton, the Defendant's mother, testified that she saw A.B. and K.B. every day when they lived with her and that the children never told her that the Defendant had touched them inappropriately. She claimed that K.B. always slept with her when K.B.'s mother was not present and that there was never a time that the Defendant was alone with the children during the entire time that they lived at the Blanton home. Felicia Blanton, the Defendant's estranged wife, testified that the Defendant had been with her at her home in McMinnville "[p]ractically almost all day" beginning in the morning on the Monday that the sheriff's department removed K.B. from the Defendant's home. At the conclusion of trial, the jury convicted the Defendant of six counts of rape of a child and two counts of aggravated sexual battery.

**Sentencing.** At the Defendant's sentencing hearing, the State admitted the presentence investigation report, which showed that the Defendant had seven prior felony convictions, including three convictions for aggravated sexual battery and four forgery convictions. The Defendant also had thirteen misdemeanor convictions, including two convictions for possession of a firearm for the purpose of going armed. The State also presented testimony from Danna Goney and Stuart Colwell, an investigator with the District Attorney's Office.

Danna Goney testified that the Defendant's family continued to maintain the Defendant's innocence and had terminated their relationship with K.B. and A.B. because of this case. In addition, the Defendant's family had "posted things online" calling K.B. and A.B. "liars." Goney stated that because of the Defendant's abuse and the mistreatment by the Defendant's family, K.B. and A.B. had been diagnosed with Post-Traumatic Stress Disorder and were receiving counseling. She said K.B. and A.B. also had night terrors and were frightened of men, even members of their mother's family with whom they previously had strong relationships. Goney's victim impact statement was admitted at this hearing.

Investigator Colwell testified that the Defendant had escaped from the Van Buren County Jail a few days before this sentencing hearing in this case and that it took six law enforcement agencies approximately seventeen hours to find him. He said that when the Defendant was finally located, he had a knife, "had barricaded himself" in a bedroom, and had threatened to commit suicide. Investigator Colwell said that law enforcement had to use three cans of tear gas before the Defendant finally surrendered after forty-five minutes of negotiations. Following this proof, the State asserted that the aforementioned incident was not the first time the Defendant had escaped from custody; the State explained that in 2006, the Defendant escaped from the same jail while he was incarcerated for aggravated sexual battery charges in an unrelated case.

The trial court, prior to sentencing the Defendant, stated that it had reviewed "the circumstances surrounding the case, the testimony during the trial, the presentence report, the testimony that was given here today, plus the statements of counsel." It asserted that the facts in this case were "very troubling" because the offenses of rape and aggravated sexual battery had been committed against "small children." The trial court found that K.B. and A.B. were "extremely truthful," that their testimony was "consistent," "did not appear to be embellished," and "did not sound rehearsed." The trial court also stated, "I have no question . . . that the jury was correct in [its] finding of the convictions on these particular [eight] counts."

The trial court recognized that the Defendant had an "extensive" criminal history and concluded that the Defendant's three previous felony convictions for aggravated sexual battery, for which he served a substantial period of time in the penitentiary, were the "most troubling." It noted that the Defendant had "a couple" of "weapons convictions" that were also "troubling," particularly in light of the Defendant's recent escape from the Van Buren County Jail where he was apprehended with a weapon. The trial court additionally recognized that the Defendant had four other felony convictions as well as approximately thirteen misdemeanor convictions, which added up to "an amazing record" for the Defendant, who was "still in his thirties." The trial court said that because it was "without question" that the Defendant had an "extensive criminal history," it applied enhancement factor (1). See Tenn. Code Ann. § 40-35-114(1).

The trial court also applied enhancement factor (14) to the Defendant's sentences after finding that the Defendant "abused a position of public or private trust . . . in a manner that significantly facilitated the commission or the fulfillment of the offense[.]" Tenn. Code Ann. § 40-35-114(14). With respect to the Defendant's convictions for rape of a child, the trial court applied enhancement factor (7) because these offenses "involved a victim and w[ere] committed to gratify the defendant's desire for pleasure or excitement[.]" Tenn. Code Ann. § 40-35-114(7). The defense acknowledged that no mitigating factors applied in this case, and the trial court applied none. See Tenn. Code Ann. § 40-35-113.

In determining whether the Defendant's sentences should be served consecutively, the trial court, relying on its previous statements regarding the Defendant's extensive record of criminal activity, applied Tennessee Code Annotated section 40-35-115(b)(2). The trial court also applied Tennessee Code Annotated section 40-35-115(b)(5), which provides that a trial court may order sentences to be served consecutively if the court finds by a preponderance of the evidence that . . . "[t]he defendant is convicted of two (2) or more statutory offenses involving sexual abuse of a minor with consideration of the aggravating circumstances arising from the relationship between the defendant and victim or victims, the time span of defendant's undetected sexual activity, the nature and scope of the sexual acts and the extent of the residual, physical and mental damage to the victim or victims[.]" See Tenn. Code Ann. § 40-35-115(b)(5). The trial court found that Code section 40-35-115(b)(5) was "extremely relevant in this particular case" because the Defendant had been convicted of two or more statutory offenses involving sexual abuse of his minor daughters, K.B. and A.B., which caused serious damage to them. The trial court recognized that "we have children here who are very young, 10 and 11 years old" and that these crimes were inflicted by "the person who was supposed to be taking care of them, someone who is a parent and the person that they should look to for security and not abuse."

When the State asked if the trial court was applying enhancement factor (13), that the Defendant was "[o]n any other type of release into the community under the direct or indirect supervision of any state or local governmental authority or a private entity contracting with the state or a local government," because the Defendant was under community supervision for life for his previous aggravated sexual battery convictions when he committed the offenses in this case, the following exchange occurred:

Defense counsel: Judge, . . . that would be something that would be forever. So I think the Court has enough things that can be used [to enhance his sentence]. I don't think that's something that—that's nothing he could ever complete and get off of.

Trial court: Okay. Considering everything, again, that I've covered, I've tried to consider everything from the beginning of the trial, the testimony, all the way through today and the closing statements of counsel. I have considered all of that and used that in determining the sentence, but the . . . overriding factors are that we have a gentleman who is only in his thirties; who has somewhere in the neighborhood of 20 prior convictions before this case; who had been convicted of molesting a child many years ago; went on to be involved with weapons

charges; and then was released and committed the acts of rape of a child [and aggravated sexual battery] against his own children over a period of many months is simply—it's just mind-boggling. This is not someone who needs to be free, period.

Although the trial court "acknowledge[d] that people can change," it concluded that the Defendant "is not one of those people, and he has proven that without question this time."

The trial court then sentenced the Defendant in Count 1, rape of a child, to forty years; in Count 2, rape of a child, to forty years; in Count 3, aggravated sexual battery, to twelve years; in Count 4, rape of a child, to forty years; in Count 5, rape of a child, to forty years; in Count 6, rape of a child, to forty years; in Count 7, rape of a child, to forty years; and in Count 8, aggravated sexual battery, to twelve years.

The trial court ordered the sentences in Count 2 and Count 3 served concurrently because these offenses of rape and aggravated sexual battery occurred "very close in time." The court also ordered the sentences in Count 5 and Count 6 served concurrently because those offenses occurred "very close in time near the same day, if not the same day." However, the trial court ordered all the other counts served consecutively, for an effective sentence of 212 years. The trial court additionally held that the Defendant would be under community supervision for life, would be required to complete a sexual offender treatment program, and would be on the sex offender registry for life.

Thereafter, the Defendant filed a motion for new trial, which the trial court denied on September 23, 2019.[5] On January 28, 2020, the Defendant filed both a notice of appeal and a motion to accept late notice of appeal, and this court granted this motion, holding that the appeal was deemed timely filed on January 31, 2020.

## ANALYSIS

**I. Sufficiency of the Evidence.** The Defendant argues that the evidence is insufficient to sustain his convictions for rape of a child in Counts 1, 2, and 4. In response, the State contends that the Defendant's criticism of the proof in this case is essentially a request for this court to reweigh the evidence. Moreover, the State asserts that the evidence,

---

[5] Although the Defendant's motion for new trial was untimely by six days, the issues that he raises in this appeal, namely sufficiency of the evidence and sentencing, are not required to be raised in a motion for new trial. See State v. Bough, 152 S.W.3d 453, 460 (Tenn. 2004) ("If a motion for new trial is not timely filed, all issues are deemed waived except for sufficiency of evidence and sentencing."). Accordingly, we will address each issue on its merits.

- 10 -

when viewed in the light most favorable to the State, is sufficient to support the Defendant's convictions for rape of a child beyond a reasonable doubt. We agree with the State.

"Because a verdict of guilt removes the presumption of innocence and raises a presumption of guilt, the criminal defendant bears the burden on appeal of showing that the evidence was legally insufficient to sustain a guilty verdict." State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009) (citing State v. Evans, 838 S.W.2d 185, 191 (Tenn. 1992)). "Appellate courts evaluating the sufficiency of the convicting evidence must determine 'whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" State v. Wagner, 382 S.W.3d 289, 297 (Tenn. 2012) (quoting Jackson v. Virginia, 443 U.S. 307, 319 (1979)); see Tenn. R. App. P. 13(e). When this court evaluates the sufficiency of the evidence on appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences that may be drawn from that evidence. State v. Davis, 354 S.W.3d 718, 729 (Tenn. 2011) (citing State v. Majors, 318 S.W.3d 850, 857 (Tenn. 2010)).

Guilt may be found beyond a reasonable doubt where there is direct evidence, circumstantial evidence, or a combination of the two. State v. Sutton, 166 S.W.3d 686, 691 (Tenn. 2005); State v. Hall, 976 S.W.2d 121, 140 (Tenn. 1998). The standard of review for sufficiency of the evidence "'is the same whether the conviction is based upon direct or circumstantial evidence.'" State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting Hanson, 279 S.W.3d at 275). The jury as the trier of fact must evaluate the credibility of the witnesses, determine the weight given to witnesses' testimony, and reconcile all conflicts in the evidence. State v. Campbell, 245 S.W.3d 331, 335 (Tenn. 2008) (citing Byrge v. State, 575 S.W.2d 292, 295 (Tenn. Crim. App. 1978)). When considering the sufficiency of the evidence, this court "neither re-weighs the evidence nor substitutes its inferences for those drawn by the jury." Wagner, 382 S.W.3d at 297 (citing State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997)).

As charged in this case, rape of a child is the "unlawful sexual penetration of a victim by the defendant or the defendant by a victim, if the victim is more than three (3) years of age but less than thirteen (13) years of age." Tenn. Code Ann. § 39-13-522 (2013). "Sexual penetration" is defined as "sexual intercourse, cunnilingus, fellatio, anal intercourse, or any other intrusion, however slight, of any part of a person's body or of any object into the genital or anal openings of the victim's, the defendant's, or any other person's body, but emission of semen is not required[.]" Id. § 39-13-501(7). In order to find a defendant guilty of rape of a child, the State must prove beyond a reasonable doubt: (1) that the defendant had unlawful sexual penetration of the alleged victim or the alleged victim had unlawful sexual penetration of the defendant; (2) that the alleged victim was more than three (3) years of age but less than thirteen (13) years of age; and (3) that the

defendant acted either intentionally, knowingly or recklessly. <u>See</u> 7 Tenn. Prac. Pattern Jury Instr. T.P.I.—Crim. 10.12.

Regarding Count 1, the Defendant urges this court to disregard K.B.'s testimony when assessing whether the evidence is sufficient to support this conviction. He claims that the rule of cancellation applies because K.B. provided contradictory testimony at trial regarding Count 1. Specifically, the Defendant asserts that although K.B.'s testimony on direct examination provided evidence that the Defendant penetrated her vagina with his tongue, her testimony on cross-examination did not, and the State failed to clarify this inconsistency during its redirect examination of K.B. The Defendant asserts that because none of the other evidence offered at trial corroborated that penetration occurred with regard to Count 1, the evidence is insufficient to sustain his conviction.

This court has recognized that "contradictory [sworn] statements by a witness in connection with the same fact cancel each other." <u>State v. Matthews</u>, 888 S.W.2d 446, 449 (Tenn. Crim. App. 1993) (citing <u>Taylor v. Nashville Banner Pub. Co.</u>, 573 S.W.2d 476, 482 (Tenn. Crim. App. 1978)); <u>see</u> <u>State v. Cayle Wayne Harris</u>, No. M2000-02143-CCA-R3-CD, 2001 WL 1218582, at *2 (Tenn. Crim. App. Oct. 12, 2001) ("The rule of cancellation is typically limited to circumstances in which the witness has sworn to each statement."). The "rule of cancellation" addresses circumstances in which "the proof of [a] fact lies wholly with one witness, and he both affirms and denies it," resulting in no "evidence at all to prove the fact." <u>Matthews</u>, 888 S.W.2d at 449-50 (quoting <u>Johnston v. Cincinnati N.O. & T.P. Ry. Co.</u>, 240 S.W. 429, 436 (Tenn. 1922)). The <u>Matthews</u> court explained that unlike a situation in which the jury hears contradictory testimony from two different witnesses and must make a credibility determination, a witness's self-contradicting testimony means that each version carries equal weight and cannot be resolved by the jury except through whimsy. <u>Id.</u> (citing <u>Johnston</u>, 240 S.W. at 436). The rule of cancellation applies "only when inconsistency in a witness'[s] testimony is unexplained and when neither version of his testimony is corroborated by other evidence." <u>Id.</u> at 450 (citing <u>Taylor</u>, 573 S.W.2d at 483). In general, testimony from a single witness will be disregarded when the testimony "is not of a cogent and conclusive nature, and 'if it is so indefinite, contradictory or unreliable that it would be unsafe to rest a conviction thereon.'" <u>Letner v. State</u>, 512 S.W.2d 643, 649 (Tenn. Crim. App. 1974) (quoting 23 C.J.S. <u>Criminal Law</u> § 903).

At trial, K.B. testified on direct examination that she awoke to the Defendant licking her vagina and putting his tongue inside it. However, during cross-examination, defense counsel said, "So the first time you say he just rubbed against you but didn't put anything in you; correct?," and K.B. replied, "Yeah." Following defense counsel's question, the State did not object and did not clarify K.B.'s response on redirect examination.

As we previously noted, the jury as the trier of fact must evaluate the credibility of the witnesses, determine the weight given to witnesses' testimony, and reconcile all conflicts in the evidence. Campbell, 245 S.W.3d at 335 (citing Byrge, 575 S.W.2d at 295). K.B. was only thirteen years old at the time she testified at trial, and the record indicates that defense counsel deliberately mischaracterized K.B.'s testimony on direct examination when he cross-examined her. Although K.B. clearly testified on direct that she awoke to the Defendant licking her vagina and putting his tongue inside it, defense counsel on cross-examination nevertheless asked, "So the first time you say he just rubbed against you but didn't put anything in you; correct?," and K.B. replied, "Yeah." While the State should have objected to defense counsel's misrepresentation of K.B.'s testimony, it was the prerogative of the jury to assess K.B.'s credibility and reconcile any conflicting evidence. Although the Defendant focuses on K.B.'s alleged inconsistencies in her response to defense counsel's misleading questioning, we recognize that we must view K.B.'s testimony as a whole. K.B. provided clear testimony on direct examination regarding the first incident of sexual abuse, and this testimony was corroborated by the statement she gave about this incident during her forensic interview. Although the Defendant argues that K.B.'s testimony on cross-examination showed that penetration did not occur during this first incident, "proof of cunnilingus is proof of sexual penetration, and additional proof of penetration of the vagina is not required." State v. Troy Love, No. E2015-02297-CCA-R3-CD, 2017 WL 1077062, at *15 (Tenn. Crim. App. Mar. 21, 2017) (citing State v. Hoyt, 928 S.W.2d 935, 942 (Tenn. Crim. App. 1994), overruled on other grounds by State v. Spicer, 12 S.W.3d 438, 447, n.12 (Tenn. 2000); State v. Alec Joseph Mesot, No. M2006-02599-CCA-R3-CD, 2008 WL 732151, at *5-6 (Tenn. Crim. App. Mar. 14, 2008)). After carefully reviewing the record, we believe any inconsistencies in K.B.'s testimony are explained by defense counsel's misleading questioning and the ongoing nature of the Defendant's abuse. See State v. Radley, 29 S.W.3d 532, 537 (Tenn. Crim. App. 1999) (stating that "a jury's verdict will not be disturbed unless the inaccuracies or inconsistencies are so improbable or unsatisfactory as to create a reasonable doubt of the appellant's guilt"). The evidence offered in support of Count 1, when viewed in the light most favorable to the State, establishes that the Defendant sexually penetrated his eleven-year-old daughter, K.B., with his tongue. Given this evidence, a rational jury could have found beyond a reasonable doubt that the Defendant intentionally, knowingly, or recklessly engaged in the unlawful sexual penetration of the victim, who was more than three years of age but less than thirteen years of age. The issue of K.B.'s credibility was clearly resolved by the jury's verdict, and we decline to reweigh the evidence or to substitute our inferences for those drawn by the jury. See Wagner, 382 S.W.3d at 297. Accordingly, we reject the Defendant's request for us to disregard K.B.'s testimony in evaluating the evidence in this case, and we conclude the evidence is more than sufficient to sustain the Defendant's conviction in Count 1 for rape of a child.

Regarding Count 2, the Defendant contends that because K.B. testified that the Defendant failed in his attempt to vaginally penetrate her, the evidence is insufficient to sustain this conviction. He asserts that the forensic interview did not provide any additional evidence of penetration because K.B. admitted during this interview that she had a "forgetful memory" and did not really remember this incident. The Defendant argues that even when viewing the evidence in the light most favorable to the prosecution, the State failed to prove the elements of rape of a child beyond a reasonable doubt.

With regard to Counts 2, K.B. testified on direct examination that the Defendant put a condom on his penis and then "tried to stick his thingy" inside her "vajayjay." She said that the Defendant was unable to get his penis inside her vagina, so the Defendant took the condom off and rubbed his penis against her vagina "[j]ust a little bit" before they left the bedroom.

We reiterate that the General Assembly has defined "sexual penetration" as "sexual intercourse, cunnilingus, fellatio, anal intercourse, or any other intrusion, however slight, of any part of a person's body . . . ." Tenn. Code Ann. § 39-13-501(7) (emphasis added). Based on K.B.'s testimony, a rational jury could have found that an intrusion of K.B.'s vulva and labia occurred when the Defendant attempted to insert his penis inside her vagina. See State v. Bowles, 52 S.W.3d 69, 74 (Tenn. 2001) (holding that penetration, which is an element of the rape of a child offense, does not require "that the vagina be entered or that the hymen be ruptured; the entering of the vulva or labia is sufficient."). Accordingly, we conclude the evidence is sufficient to sustain the Defendant's conviction in Count 2 for rape of a child.

Regarding Count 4, the Defendant again asserts that the rule of cancellation applies because K.B. both affirmed and denied that the Defendant sexually penetrated her for the purpose of this count. He claims that although K.B.'s testimony on direct examination provided evidence of vaginal penetration, her testimony on cross-examination did not, and the State "failed to elicit any reason as to why [K.B.] offered contradictory testimony as to a crucial element of Tenn. Code Ann. § 39-13-522 on cross-examination." Although the Defendant challenges K.B.'s testimony regarding the time of the day that this incident occurred and whether the police arrived at the Defendant's home during this incident, we agree with the State that the only issue is whether the Defendant vaginally penetrated K.B. during the incident charged in Count 4.

With regard to this count, K.B. testified that the Defendant put his penis inside her vagina while they were in the middle bedroom. She stated, "[H]e got, like, there's a head part and he got it inside of my vajayjay hole." She explained that the "head part" was the "tip" of the Defendant's "thingy" that is between the Defendant's legs and that the tip of the Defendant's penis got partway inside her vagina. On cross-examination, defense

counsel asked, "And then the third time you said that he tried to put something in you and then he jumped up and ran out of the house and the police were there; right?," and K.B. replied, "Yeah." On redirect examination, K.B. stated that there was one incident of sexual abuse when the Defendant ran outside when the deputies arrived at the home. However, she said that during a different incident of abuse that occurred the same day the deputies removed her from the home, the Defendant was not present.

A close review of the trial transcript shows that defense counsel also mischaracterized K.B.'s testimony on direct examination as it related to Count 4. Although K.B. clearly testified on direct examination that the Defendant got the "head part" of his penis inside her vagina, which was corroborated by her statement about this incident during her forensic interview, defense counsel on cross-examination nevertheless asked, "And then the third time you said that he tried to put something in you and then he jumped up and ran out of the house and the police were there; right?," and K.B. replied, "Yeah." Once again, we believe any inconsistencies in K.B.'s testimony were explained by defense counsel's misleading questioning and the continuing nature of the Defendant's abuse. Based on the evidence presented at trial for Count 4, a rational jury could have found beyond a reasonable doubt that the Defendant intentionally, knowingly, or recklessly engaged in the unlawful sexual penetration of the victim, and we decline to reweigh the evidence or to substitute our inferences for those drawn by the jury. See Wagner, 382 S.W.3d at 297. Therefore, we again reject the Defendant's request for us to disregard K.B.'s testimony, and we conclude the evidence is sufficient to sustain the Defendant's conviction in Count 4.

**II. Sentencing.** In support of his claim that his sentence is excessive, the Defendant maintains that the trial court erred in applying the enhancement factors in Code sections 40-35-114(7) and 40-35-114(13) and claims that the trial court failed to follow the purposes and principles of sentencing in imposing his sentence. In response, the State argues that the trial court properly exercised its discretion in applying these enhancement factors and in imposing an effective sentence of 212 years. We conclude that the trial court properly applied enhancement factor (7) but did not apply enhancement factor (13) prior to sentencing the Defendant in this case. We also conclude that the trial court properly applied the purposes and principles of the Sentencing Act and did not abuse its discretion in imposing the sentence in this case.

This court reviews a trial court's sentencing determinations under "an abuse of discretion standard of review, granting a presumption of reasonableness to within-range sentencing decisions that reflect a proper application of the purposes and principles of our Sentencing Act." State v. Bise, 380 S.W.3d 682, 707 (Tenn. 2012). A trial court abuses its discretion only when it applies an incorrect legal standard, reaches an illogical conclusion, bases its decision on a clearly erroneous assessment of the evidence, or

employs reasoning that causes an injustice to the party complaining. State v. Herron, 461 S.W.3d 890, 904 (Tenn. 2015). The 2005 amendments to the Sentencing Act "served to increase the discretionary authority of trial courts in sentencing." Bise, 380 S.W.3d at 708. In particular, these amendments "rendered advisory the manner in which the trial court selects a sentence within the appropriate range, allowing the trial court to be guided by— but not bound by—any applicable enhancement or mitigating factors when adjusting the length of a sentence." Id. at 706. "[W]hile a trial court's less comprehensive findings may require appellate courts to more carefully review the record, sentences should be upheld so long as the statutory purposes and principles, along with any applicable enhancement and mitigating factors, have been properly addressed." Id. When imposing a sentence, a trial court "shall place on the record, either orally or in writing, what enhancement or mitigating factors were considered, if any, as well as the reasons for the sentence, in order to ensure fair and consistent sentencing." Tenn. Code Ann. § 40-35-210(e).

A trial court must consider the following when determining a defendant's sentence:

(1) The evidence, if any, received at the trial and the sentencing hearing;
(2) The presentence report;
(3) The principles of sentencing and arguments as to sentencing alternatives;
(4) The nature and characteristics of the criminal conduct involved;
(5) Evidence and information offered by the parties on the mitigating and enhancement factors set out in §§ 40-35-113 and 40-35-114;
(6) Any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee;
(7) Any statement the defendant wishes to make on the defendant's own behalf about sentencing; and
(8) The result of the validated risk and needs assessment conducted by the department and contained in the presentence report.

Id. § 40-35-210(b). In addition, the trial court must consider "the record of prior felony convictions filed by the district attorney general with the court, as required by § 40-35-202(a)." Id. § 40-35-210(f).

The trial court shall impose "a sentence justly deserved in relation to the seriousness of the offense[.]" Id. § 40-35-102(1). The court must consider the defendant's potential for rehabilitation or treatment. Id. §§ 40-35-102(5), -103(5). In addition, the court must impose a sentence "no greater than that deserved for the offense committed" and "the least severe measure necessary to achieve the purposes for which the sentence is imposed[.]" Id. §§ 40-35-103(2), (4).

**A. Enhancement Factors.** First, the Defendant argues that the trial court erred in applying enhancement factor (7) to his rape convictions because the State failed to prove that he committed any of the rapes "to gratify [his] desire for pleasure or excitement. Id. § 40-35-114(7). He asserts that the offense of rape has no motive component and that unlike sexual battery, a defendant may commit a rape for reasons other than sexual pleasure or gratification. He also claims that "[t]he only testimony beyond the acts themselves was that [the Defendant] ejaculated" but that "[e]jaculation alone . . . is insufficient to establish the facts necessary to apply Tenn. Code Ann. § 40-35-114." See State v. Kissinger, 922 S.W.2d 482, 490-91 (Tenn. 1996) ("That orgasm did or did not occur is simply one factor a court may consider in determining whether the offender committed the offense to gratify the offender's desire for pleasure or excitement."). The Defendant maintains that the trial court failed to enumerate any facts upon which it relied in applying enhancement factor (7), stating only that it generally relied on the circumstances in the case, the testimony at trial, and the statements of counsel. See State v. Arnett, 49 S.W.3d 250, 262 (Tenn. 2001) (noting that "the trial court did not identify the specific grounds upon which it applied factor (7) other than to deem it appropriate 'under all the facts and circumstances of the case'" before conducting a de novo review of the record).

In determining whether to apply enhancement factor (7) to sexual offenses, the trial court must consider the defendant's "motive for committing the offense." Id. at 261 (citing Kissinger, 922 S.W.2d at 490). We recognize that "proper application of factor (7) requires the State to provide . . . objective evidence of the defendant's motivation to seek pleasure or excitement through sexual assault." Id. at 262. Such evidence may include, but is not limited to "sexually explicit remarks and overt sexual displays made by the defendant, such as fondling or kissing a victim or otherwise behaving in a sexual manner, or remarks or behavior demonstrating the defendant's enjoyment of the sheer violence of the rape." Arnett, 49 S.W.3d at 262 (citations omitted).

At the sentencing hearing, the trial court considered whether the Defendant had committed the rapes of K.B. to gratify his desire for pleasure or excitement and concluded that "certainly [wa]s true." Before sentencing the Defendant, the trial court stated that it had reviewed "the circumstances surrounding the case, the testimony during the trial, the presentence report, the testimony that was given here today, plus the statements of counsel." It found that the facts in this case were "very troubling" because the offenses of rape and aggravated sexual battery had been committed against "small children." The trial court also found that K.B. and A.B. were "extremely truthful," that their testimony was "consistent," "did not appear to be embellished," and "did not sound rehearsed." While the trial court did not specifically identify the specific facts on which it relied in concluding that the Defendant raped K.B. to gratify his desire for pleasure or excitement, it did conclude that enhancement factor (7) should "certainly" be applied after finding that K.B. provided extremely credible testimony regarding the rapes. In addition to providing

specific details regarding the Defendant's overt sexual displays and behavior during each rape, K.B. specifically testified that the Defendant compared her to his wife Felicia and to K.B.'s mother and said that K.B. "was the best" and "was better than them." See State v. Jones, 953 S.W.2d 695, 699 (Tenn. Crim. App. 1996) (concluding that the trial court did not err in applying enhancement factor (7) when the defendant "treated his daughter as if she were his girlfriend"). K.B. also testified that the Defendant called her "vajayjay" a "gold mine." Accordingly, we conclude that the record fully supports the trial court's finding that the Defendant's committed these rapes to gratify his desire for pleasure or excitement.

Second, the Defendant argues that the trial court erred in applying the enhancement factor in Code section 40-35-114(13) (allowing a trial court to enhance a defendant's sentence when, at the time the felony was committed, the defendant was "[o]n any other type of release into the community under the direct or indirect supervision of any state or local governmental authority or a private entity contracting with the state or a local government"). He states that he found no cases in which the lifetime supervision requirements of the Tennessee Sexual Offender and Violent Sexual Offender Registration, Verification and Tracking Act of 2004 have been used to enhance a sentence pursuant to Code section 40-35-114(13). See Tenn. Code Ann. § 40-39-201 et. seq. The Defendant also asserts that the legislature made no reference to Code section 39-13-524, which requires a sentence of community supervision for life for individuals convicted of certain offenses, and the legislature could have included the community supervision for life in enhancement factor (13) had it wished to do so. The Defendant also asserts that while community supervision for life is placed on defendants after they have completed their sentence, the legislature intended Code section 40-35-114(13)(A)-(I) to apply only to those individuals who commit felonies while serving another sentence. We conclude, after carefully reviewing the transcript from the sentencing hearing, that the trial court did not rely on enhancement factor (13) to enhance the Defendant's sentences in this case. Therefore, the Defendant is not entitled to relief on this issue. Moreover, although this issue was not specifically raised by the Defendant, we also conclude that the Defendant's sentences, which were within the proper ranges of punishment, were presumptively reasonable, and the Defendant has not overcome this presumption.

**B. Application of the Purposes and Principles of the Sentencing Act.** The Defendant also generally argues that his sentence of 212 years fails to comport with the purposes and principles of the Sentencing Act. Although the Defendant concedes that the trial court properly applied Code sections 40-35-115(b)(2) and (b)(5), he asserts that consecutive sentences should only be imposed after the trial court finds that confinement for such a term is necessary in order to protect society. See Gray v. State, 538 S.W.2d 391, 393 (Tenn. 1976) ("[A] consecutive sentence should be imposed only after a finding by the trial judge that confinement for such a term is necessary in order to protect the public from

further criminal conduct by the defendant." (footnote omitted)). He also argues that the aggregate sum must be reasonably related to the severity of the offenses involved. See State v. Taylor, 739 S.W.2d 227, 230 (Tenn. 1987) (recognizing that "[t]rial courts should weigh the aggravating circumstances arising from the relationship between defendant and the victim or victims, the age of the victim or victims, the time span of defendant's undetected sexual activity, the nature and scope of the sexual acts and the extent of the residual physical and mental damage to the victim or victims and determine the appropriate use of consecutive sentencing accordingly" but also cautioning that "consecutive sentences should not routinely be imposed in sexual abuse cases, or in other cases, and that the aggregate maximum of consecutive terms must be reasonably related to the severity of the offenses involved."). Lastly, the Defendant contends that "offenses which overlap with the same intent are appropriate for concurrent sentencing." State v. Desirey, 909 S.W.2d 20, 34 (Tenn. Crim. App. 1995).

Where a defendant is convicted of one or more offenses, the trial court has discretion in determining whether the sentences shall be served concurrently or consecutively. Tenn. Code Ann. § 40-35-115(a). "[T]he abuse of discretion standard, accompanied by a presumption of reasonableness, applies to consecutive sentencing determinations." State v. Pollard, 432 S.W.3d 851, 860 (Tenn. 2013). A trial court may order multiple offenses to be served consecutively if it finds by a preponderance of the evidence that a defendant fits into at least one of the seven categories in Code section 40-35-115(b). This court must give "deference to the trial court's exercise of its discretionary authority to impose consecutive sentences if it has provided reasons on the record establishing at least one of the seven grounds listed in Tennessee Code Annotated section 40-35-115(b)[.]" Pollard, 432 S.W.3d at 861. When imposing consecutive sentences, the court must still consider the general sentencing principles that each sentence imposed shall be "justly deserved in relation to the seriousness of the offense," "no greater than that deserved for the offense committed," and "the least severe measure necessary to achieve the purposes for which the sentence is imposed." Tenn. Code Ann. §§ 40-35-102(1), -103(2), -103(4); State v. Imfield, 70 S.W.3d 698, 708 (Tenn. 2002). "So long as a trial court properly articulates reasons for ordering consecutive sentences, thereby providing a basis for meaningful appellate review, the sentences will be presumed reasonable and, absent an abuse of discretion, upheld on appeal." Pollard, 432 S.W.3d at 862 (citing Tenn. R. Crim. P. 32(c)(1); Bise, 380 S.W.3d at 705).

Here, the trial court imposed partially consecutive sentencing after applying Code sections 40-35-115(b)(2) and (b)(5). Specifically, the trial court ordered the sentences in Counts 2 and 3 to be served concurrently and the sentences in Counts 5 and 6 to be served concurrently because these pairs of offenses occurred "very close in time." However, the trial court ordered all the other counts to be served consecutively, for an effective sentence of 212 years.

First, the trial court determined that consecutive sentencing was appropriate because the Defendant had an extensive record of criminal activity pursuant to Code section 40-35-115(b)(2). The trial court found that the Defendant's criminal history, which included at least seven felonies and approximately thirteen misdemeanor convictions, was "extensive" and declared that the Defendant's three prior convictions for aggravated sexual battery, for which he served a substantial period of time in the penitentiary, were the "most troubling." The trial court also determined that the Defendant's prior convictions for weapons charges were "troubling[,]" especially given that the Defendant had recently escaped from the Van Buren County Jail and had possessed a weapon at the time he was apprehended. The record also indicates that the Defendant had a prior conviction for felony escape in 2007.

Second, the trial court found that consecutive sentencing was proper, pursuant to Code section 40-35-115(b)(5), because the Defendant stood "convicted of two (2) or more statutory offenses involving sexual abuse of a minor with consideration of the aggravating circumstances arising from the relationship between the defendant and victim or victims, the time span of defendant's undetected sexual activity, the nature and scope of the sexual acts and the extent of the residual, physical and mental damage to the victim or victims[.]" The trial court determined that Code section 40-35-115(b)(5) was "extremely relevant in this particular case" because the Defendant had been convicted of two or more statutory offenses involving the sexual abuse of his daughters K.B. and A.B., which had caused substantial damage to them. The trial court recognized that "we have children here who are very young, 10 and 11 years old" and that these crimes were inflicted by "the person who was supposed to be taking care of them, someone who is a parent and the person that they should look to for security and not abuse." The record fully supports the trial court's application of Code sections of Code sections 40-35-115(b)(2) and (b)(5).

When considering the appropriate sentence in this case, the trial court expressed great concern that the Defendant, who was "only in his thirties," had an extensive criminal history and had sexually abused his own daughters "over a period of many months" following his previous convictions for "molesting a child many years ago." The trial court candidly stated, "This is not someone who needs to be free, period." Although the trial court "acknowledge[d] that people can change," it concluded that the Defendant "is not one of those people, and he has proven that without question this time."

We conclude that the trial court did not abuse its discretion in imposing partially consecutive sentencing and properly considered the purposes and principles of the Sentencing Act. The trial court appropriately determined that the effective sentence in this case was reasonably related to the severity of the offenses, the Defendant's extensive criminal history, and the compelling need to protect society from further criminal conduct by the Defendant. Because the trial court did not abuse its discretion in imposing the sentence in this case, the Defendant is not entitled to relief.

## CONCLUSION

We conclude that the evidence is sufficient to sustain the Defendant's convictions in Counts 1, 2, and 4 and that trial court did not abuse its discretion in imposing the Defendant's sentence. Accordingly, the judgments of the trial court are affirmed.

_____
CAMILLE R. MCMULLEN, JUDGE